# United States District Court
# Eastern District of Wisconsin
# Milwaukee Division

| | |
|---|---|
| **John Swaffer, Jr.** <br><br> *Plaintiff*, <br><br> v. <br><br> **David Deininger**, et. al., <br><br> *Defendants*. | *Civil Action No.* _____ <br><br> **Memorandum in Support <br> of Temporary Restraining Order <br> and Preliminary Injunction** |

## Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction

### Facts

On April 1, 2008, the town of Whitewater, located in Walworth County Wisconsin, will vote on three local referendum questions (the "Referendums") that would permit liquor sales and the issuance of liquor licenses in Whitewater. Whitewater is currently a "dry" town and has been so since 1977.

John Swaffer opposes the Referendums and believes many Whitewater residents are unaware of them. Therefore, he wants to send post cards ("the Mailer") bringing awareness to the Referendums and expressly advocating a vote against them. *See* VC Exhibit A. The Mailer will be sent to Whitewater residents. Mr. Swaffer also wants to make yard signs (the "Signs") that

**Memorandum in Support of TRO\PI**

will urge residents to vote "no" on the Referendums. He believes that if Whitewater residents are made aware of the Referendums they will overwhelmingly defeat them.

Mr. Swaffer will make a "disbursement" as defined by Wis. Stat. § 11.01(7)[1] of over $25 (a statutory trigger) to print and distribute the Mailer and Signs. He anticipates the total cost to be between $200 and $300. He will accept a contribution of over $100 (the statutory trigger) to help offset the costs of printing and distributing the Mailer and Signs. The source of this contribution is an individual also opposed to the Referendums who is ready, willing and able to contribute $120 for this purpose.

Mr. Swaffer does not want to comply with the registration and reporting requirements triggered by § 11.23 because he believes they violate his First Amendment rights. Mr. Swaffer does not want to comply with the disclaimer requirement of § 11.30 because he believes it violates his First Amendment rights.

Mr. Swaffer fears both civil and criminal prosecution if he makes an expenditure for acquiring a mailing list or for producing the Mailer or Signs or sends the Mailer and distributes the Signs without complying with the requirements of § 11.23 and § 11.30. His fear of enforcement stems in part from his awareness of the investigation of his friend Charles Hatchett who participated in substantially similar activities in 2006 addressing a Whitewater referendum on the same subject. *See* VC Exhibit B (*Declaration of Charles G. Hatchett*).

Mr. Swaffer fears retaliation if forced to include the disclaimer on his Mailer and Signs because the Referendums are controversial in the Whitewater community and he believes many of the Referendums' supporters are particularly influential and powerful members of the

---

[1] Unless otherwise noted, all references to statutes are to Wisconsin Statutes (Wis. Stat.).

**Memorandum in Support of TRO\PI**     2

community. His fear of retaliation stems in part from his awareness of the recent experience of his friend Scott Hatchett. *See* VC Exhibit C (*Declaration of Scott Hatchett*).

Mr. Swaffer wants to send the Mailer and distribute the Signs no later than March 25, 2008, a week prior to the election to be held on April 1, 2008. Mr. Swaffer believes that this is the most effective timing for his advocacy. Preparations for these activities, including acquiring address lists and printing signs and post cards, need begin expeditiously. But under § 11.23, Mr. Swaffer cannot make the necessary expenditures until he has complied with requirements of § 11.05(2), and the Mailer and Signs cannot be printed until he knows whether the required disclaimer must be included or not.

Mr. Swaffer seeks a restraining order and/or immediate injunctive relief allowing him to produce and distribute the Mailer and Signs without complying with the burdensome requirements triggered by § 11.23, and without including the compelled disclaimer of § 11.30 and Wis. Admin. Code § ElBd 1.655.

## Argument

Preliminary relief, including a temporary restraining order, "is properly sought only to avert irreparable harm to the moving party." *Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006). To obtain a preliminary injunction a movant must show "(1) they are reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest." *Joelner v. Village of Washington Park*, 378 F.3d 613, 619-20 (7th Cir. 2004). If this initial burden is met the court may employ a "sliding scale" analysis to weigh the factors against

**Memorandum in Support of TRO\PI**  3

one another. *Id.* "When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor." *Id*.

I. **Mr. Swaffer Has a Strong Likelihood of Success on the Merits.**

   A. **The Statutes at Issue Here Are Restrictions on Core First Amendment-Protected Political Speech and Are Subject to Strict Scrutiny.**

"The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Meyer v. Grant*, 486 U.S. 414, 421 (1988) (*quoting Roth v. United States,* 354 U.S. 476, 484 (1957)). Mr. Swaffer's efforts to convince his Whitewater neighbors to vote against the Referendums is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 420-21 (citation and footnote omitted). *See also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ( "the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office" and applies equally to "issue-based elections"); *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 776-777, (1978) (speech on income tax referendum "is at the heart of the First Amendment's protection"). The decision, by way of local referendums, of whether the town of Whitewater, Wisconsin should or should not allow the sale of liquor within its boundaries "is a matter of societal concern that [Mr. Swaffer has] a right to discuss publicly without risking criminal sanctions." *Id.* at 421.

Where, as here, restrictions on referendum advocacy "significantly inhibit communication with voters about proposed political change," *Buckley v. American Const'l Law Found.*, 525 U.S. 182, 192 (1999) ("*Buckley II*"), they must be "narrowly tailored to a compelling state interest."

**Memorandum in Support of TRO\PI**         4

*Id.* at 192 n.12.

### B. The Regulations Are Sufficiently Burdensome to Warrant Strict Scrutiny.

#### 1. The Disclaimer Requirement Forbids Anonymous Campaign Speech and Compels Content Mr. Swaffer Would Otherwise Exclude.

Wisconsin requires that "[t]he source of every printed advertisement, billboard, handbill, sample ballot, television or radio advertisement or other communication which is paid for by. . . [a] disbursement. . . shall appear clearly thereon." § 11.30(2)(a); Wis. Admin. Code § ElBd 1.655. Mr. Swaffer's Mailer and Signs are subject to the disclaimer requirement as they qualify as communications paid for by a "disbursement" as defined in § 11.01(7)(a). Communications paid for by a disbursement must include the disclaimer "Paid for by" followed by the name of the individual. § 11.30(2)(c). Failure to comply with this disclaimer requirement can trigger either criminal prosecution or a civil enforcement actions. §§ 11.60, 11.61. Wisconsin's disclaimer requirement places a severe burden on core political speech.

"[A]n author's decision to remain anonymous. . . is an aspect of the freedom of speech protected by the First Amendment." *McIntyre*, 514 U.S. at 342. "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, or by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as is possible." *Id.* at 342. Retaliation includes "some dirty looks, a few snide comments, and such, and . . . courts have long recognized that mild forms of retaliation can be effective in deterring the exercise of free speech." *Majors v. Abell*, 361 F.3d 349, 353 (7th Cir. 2004). Based on the Hatchetts' experience with a nearly identical referendum, Mr. Swaffer could reasonably expect some retaliation should he be identified on his communications.

**Memorandum in Support of TRO\PI**         5

Moreover, "quite apart from any threat of persecution, an advocate may believe her ideas will be more persuasive if her readers are unaware of her identity." *McIntyre*, 514 U.S. at 342. Therefore, "the identity of the speaker is no different from other components of the document's content that the author is free to include or exclude." *Id.* at 348. Those reading Mr. Swaffer's communications "can evaluate its anonymity along with its message, as long as they are permitted, as they must be, to read that message." *Id.* Thus, Wisconsin must justify its disclaimer requirement by showing it is narrowly tailored to achieve a compelling state interest. *Majors*, 361 F.3d at 353.

### 2. The PAC-Like Burdens Triggered By § 11.23 Warrant Strict Scrutiny.

Before spending any money on the Mailer and Signs, Mr. Swaffer first must file a registration statement and set up a separate, segregated account. §§ 11.23; 11.05(3). He must record all "contributions, disbursements and incurred obligations exceeding $10" and maintain "such records in an organized and legible manner, for not less than 3 years after the date of [the Referendum]." Mr. Swaffer must then comply with the myriad administrative, reporting, and disclosure requirements of § 11.06, and must continue to do so unless he "determines that obligations will no longer be incurred, contributions will no longer be made or received or disbursements made during a calendar year in an aggregate amount of more than $1,000," files a "suspension report," and secures from the state an exemption from the reporting requirements for one calendar year. § 11.19(2).[2] Mr. Swaffer can escape the onerous requirements permanently

---

[2] Under § 11.06, the reports must list "all contributions received, contributions or disbursements made, and obligations incurred," and must contain the following information, covering the period since the last date covered on the previous report, unless otherwise provided: Names and addresses of any contributor of $20 or more in aggregate over the calender year, the occupation and employer information of any contributor giving $100 or more in aggregate in the calender

**Memorandum in Support of TRO\PI**        6

only by "disband[ing] or determin[ing] that obligations will no longer be incurred, and contributions will no longer be received nor disbursements made during a calendar year," squaring away any "outstanding incurred obligations," disposing of "residual funds" and filing a termination report. § 11.19(1).

The compelled disclosure required by § 11.23 "in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment," and the "significant encroachments on First Amendment rights of the sort that compelled disclosure imposes . . . . must survive exacting scrutiny." *Buckley v. Valeo*, 424 U.S. 1, 64 (1976). *See also McIntyre*, 514 U.S. at 347 (requiring disclosure on handbills designed to influence voters in a referendum election is subject to "exacting scrutiny," and upheld "only if it is narrowly tailored to serve an overriding state interest"); *Bellotti*, 435 U.S. at 786 ("exacting scrutiny" of restriction on express advocacy regarding referenda requires the state to show "'a subordinating interest which is compelling'" and the regulation must be "'closely drawn to avoid unnecessary abridgment.'" (citations omitted)). Likewise, in *Buckley II*, the Supreme Court agreed that the compelled "'detailed monthly disclosure[ ]'" by ballot measure proponents providing the "name and addresses (residential and business) of each paid circulator, and the amount of money paid and owed to each circulator," 525 U.S. at 201, were restrictions that significantly inhibited communication and were subject to strict scrutiny. *Id.* at 201-03.

---

year, name and address of any other registrant from whom the individual has received funds, itemized statement of other income in excess of $20, itemized list of donations made to charity from contributions received, itemized list of any loans made to the registrant and information of the lender and guarantor of any such loan, detailed information of every disbursement made, contribution received, or obligation incurred over $20, cumulative totals for all contributions, disbursements and transfers for the calender year, and the cash balance remaining on hand.

**Memorandum in Support of TRO\PI**    7

Moreover, § 11.23 imposes organizational, recordkeeping, and reporting burdens that are themselves subject to strict scrutiny. The Supreme Court has held that compliance with such burdens is "a severely demanding task," *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 256 (1986) ("*MCFL*"), that "creates a disincentive for organizations to engage in political speech." *Id.* at 254. Because such requirements have the "practical effect" of "discourag[ing] protected speech," they are "an infringement on First Amendment activities", subject to strict scrutiny. *Id.* at *id.* at 255; 256 (organizational, recordkeeping and reporting requirements "must be justified by a compelling state interest."); *see also Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652, 658 (1990) (organizational, disclosure, recordkeeping and reporting "requirements . . . burden expressive activity" and so "must be justified by a compelling state interest"). Wisconsin's organizational, recordkeeping, and reporting requirements closely mirror the "political action committee" or "PAC-like" requirements held to trigger strict scrutiny in *MCFL* and *Austin*.[3]

### C. The Statutes Fail Strict Scrutiny.

Strict scrutiny requires a compelling interest to justify a regulation's burden on First Amendment rights. The compelling interest in "preventi[ng] . . . corruption and the appearance of

---

[3]*Compare* §§ 11.23(1), 11.14,11.05(2) & (3) (requiring registration statement identifying treasurer and any "other custodian of books and accounts," and establishing and identifying a separate bank account) *with MCFL*, 479 U.S. at 253 (PAC must appoint a treasurer, "file a statement of organization containing its name, address, the name of its custodian of records, and its banks, safety deposit boxes, or other depositories); § 11.23(3) (recordkeeping requirements) and § 11.19 (dissolution requirements) *with MCFL*, 479 U.S. at 253 (PAC recordkeeping and dissolution requirements); § 11.06 (schedule and contents of periodic reporting) with MCFL, 479 U.S, at 253-54 (PAC reporting requirements). *See also Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652, 657-58 (1990) (comparing similar Michigan PAC requirements to those enumerated in *MCFL* and finding their "burden [on] expressive activity. . . . must be justified by a compelling state interest.").

**Memorandum in Support of TRO\PI**      8

corruption spawned by the . . . coercive influence of large financial contributions on candidates' positions and on their actions if elected to office" justifies regulation of contributions in elections for public office. *Buckley*, 424 U.S. at 26. But the anti-corruption interest is not relevant in referenda elections *at all*. "Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue." *Bellotti*, 435 U.S. at 790. *There is no candidate to corrupt*: "ballot initiatives do not involve the risk of '*quid pro quo*' corruption present when money is paid to, or for, candidates." *Buckley II*, 525 U.S. at 203. *See also Meyer*, 486 U.S. at 427-28 (same); *McIntyre*, 514 U.S. at 352, n. 15 ("ballot issues . . . present . . . [no] potential appearance of corrupt advantage" and listing cases so holding).

    **1.   The Disclaimer Requirement is Not Narrowly Tailored To Any Compelling Government Interest.**

Wisconsin's disclaimer requirement is not narrowly tailored to any compelling state interest. In *McIntyre*, Mrs. McIntyre was fined for distributing "unsigned" handbills opposing a school tax referendum. 514 U.S. at 338. The Court noted that unlike disclaimers on political advocacy in the election of candidates, requiring disclosure in the context of ballot referendums rests on "less powerful state interests." *Id*. at 356. Namely, as noted *infra*, the state has no anti-corruption interest in regulating issue referendum elections. *Id.* at 351-52, n.15.

The "less powerful" interests alluded to in *McIntyre* include that of "providing the electorate with relevant information. . . ." *Id.* at 348.[4] The Supreme Court rejected this interest as sufficient

---

[4] The Court held that the statute was not narrowly tailored to Ohio's asserted interest in "preventing fraud and libel," noting that the statute "encompasses documents that are not even arguably false or misleading." *Id.* at 351-52. Furthermore, the law applied to "ballot issues that present neither a substantial risk of libel nor any potential appearance of corrupt advantage." *Id*.

**Memorandum in Support of TRO\PI**     9

to warrant disclaimers on political speech. "The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." 514 U.S. at 349. The Court also noted in the case of a "handbill written by a private citizen who is not known to the recipient, the name and address of the author add little, if anything to the readers ability to evaluate the document's message." *Id*. at 348. The Court concluded that the state's "informational interest [was] plainly insufficient to support the constitutionality of its [disclaimer] requirement. *Id.*

The Seventh Circuit upheld an Indiana statute requiring disclaimers on political advertising expressly advocating for or against a clearly identified candidate. *Majors*, 361 F.3d 349. *Majors* distinguished *McIntyre* by noting *McIntyre* was "about issue referenda, where there are no candidates. . . ." *Id.* at 354. And, "*McIntyre* itself, expressly or implicitly contrast[ed] the fragility of the small independent participant in political campaigns with large corporations or other organizations." *Id.* at 355. Citing to cases distinguishing *McIntyre*, the Seventh Circuit noted that such cases rested on the "weightier ground" of a state seeking to avoid confusion as to whether a advertisements were authorized by a candidate as well as deterring corruption from supporters seeking a *quid pro quo*. *Id.* at 351. Neither such interest is at stake in ballot referendums.

Like the statute struck down in *McIntyre*, § 11.30 is not narrowly tailored to a compelling state interest. Just like Mrs. McIntyre's handbills, John Swaffer's Mailer and Signs are his personal view and are distributed by him as an individual. And, the political speech contained therein pertains to a controversial local ballot referendum, "the essence of First Amendment expression." *McIntyre*, 514 U.S. 347. "No form of speech is entitled to greater constitutional protection. . . ." *Id.* Any state informational interest could be achieved by the far less restrictive

**Memorandum in Support of TRO\PI**       10

means of simply notifying the Government Accountability Board ("GAB") of "the amount and use of money expended in support of [the referenda]." *McIntyre*, 514 U.S. at 355 ("Though such mandatary [expenditure] reporting undeniable impedes protected First Amendment activity, the intrusion is a far cry from compelled self-identification on all election-related writings.").[5] Furthermore, requiring the disclaimer may well trigger retaliation from political opponents while providing no useful information to the voting public. The disclaimer is unconstitutional both facially and as applied to Mr. Swaffer's activities.

    **2.**    **§ 11.23 Is Not Narrowly Tailored to Any Compelling Government Interest.**

Regulations requiring disclosure of contributions to candidates and expenditures for communications expressly advocating for the election or defeat of a clearly identified candidate may further compelling government informational interests:

> First, campaign finance disclosure informs voters of the candidate's place in the political spectrum and alerts them "to the interests to which a candidate is most likely to be responsive." [*Buckley*, 424 U.S. at 67] Second, "disclosure requirements deter actual corruption and avoid the appearance of corruption." Third, "disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations."[*Id.* at 68.]

*American Constitutional Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1104 (10th Cir.1997) ("*ACLF*"). In *ACLF*, the Tenth Circuit held that with respect to compelled disclosure by a ballot measure's proponents, "[n]one of the three interests the Court found sufficient in *Buckley* are

---

[5] The Supreme Court has held that individuals and groups "who occasionally make independent expenditures" expressly advocating the election or defeat of a clearly identified candidate are narrowly drawn if they require reporting only when upon an expenditure for express advocacy and the report's contents are limited to the amount spent, the recipient of the expenditure, the identification of contributors who gave for the articulated purpose of influencing the election, and the contributors who earmarked their giving for expenditures for express advocacy. *See MCFL* 479 U.S. at 252; *Buckley*, 424 U.S. at 75-76.

**Memorandum in Support of TRO\PI**    11

relevant . . . . The first and third are inapplicable because [the ballot measure proponent reporting and disclosure requirements][6] address[ ] expenditures, not contributions. The second is inapplicable because "quid pro quo" concerns are not present here." *Id.* at 1104-05 (citations omitted). The court then found the disclosure requirements were not narrowly tailored to any compelling government interest in "enable signers to determine whether there is "grassroots" support for a measure" or "discouraging fraud." *Id.* at 1105.

The Supreme Court affirmed the Tenth Circuit's decision striking the "detailed monthly reporting" and upholding only disclosure of "petition proponents' names . . . [and] of proposed ballot measures for which paid circulators were engaged." *Buckley II*, 525 U.S. at 201; 204. The Court also noted that "[d]isclosure of the names of initiative sponsors, and of the amounts they have spent gathering support for their initiatives" sufficiently responds to any "substantial state interest" in "disclosure as a control or check on domination of the initiative process by affluent special interest groups." *Id.* at 202-03.[7]

Thus, the only reporting upheld in *ACLF* was modest, simple, event-based reporting by

---

[6]The law at issue in *ACLF* required the ballot measure proponent to disclose, with its filing of the petition, the personal information of all circulators paid to circulate any section of the petition, the amount paid per signature, and the total amount paid to each circulator. Proponents were also required to file verified monthly reports disclosing the name of the proposed ballot measure, the personal and business information of each of the paid circulators, and the amount of money paid and owed to each paid circulator for petition circulation during the month in question.

[7]The Ninth Circuit has also held that PAC-like requirements very similar to Wisconsin's are not narrowly tailored to a compelling government informational interest. *See California Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1187-89 (9th Cir. 2007). And the District Court of Maine found the "legitimate interest in letting the voters know where the money comes from" in ballot measure elections did not justify requiring an individual to register and conform to PAC-like requirements in order to make expenditures for express ballot measure advocacy. *Volle v. Webster*, 69 F. Supp 2d 171, 176 ( D. Me. 1999).

**Memorandum in Support of TRO\PI**     12

ballot measure *proponents*. A ballot measure's proponent is analogous to a candidate's own campaign committee. If no government interest justifies more than modest disclosure by a ballot measure's proponents, *a fortiori*, there is no compelling interest justifying extensive disclosure by an individual or entity merely spending $1,000 to advocate for or against a referendum or accepting $101 from a like-minded individual to help with the communications' costs.

Wisconsin's disclosure and reporting requirements are broader in scope and application than those at issue in *ACLF*. In fact, the requirements the court *struck* in *ACLF* were more limited in the disclosure they compelled than those Wisconsin imposes under § 11.23. *Compare infra*, n.6 *with* §§ 11.05(3), 11.06. And the unconstitutional Colorado regulations were less onerous in another critical respect: they imposed no organizational or recordkeeping requirements. The "additional organizational restraints" of "requir[ing] [groups] "to assume a more formalized organizational form" in order to "engag[e] in campaign speech" are a more "significant burden" than "the disclosure requirements that [such groups] must satisfy." *MCFL* 479 U.S. at 266 (O'Connor, J. concurring in part and concurring in judgment). The burdens Wisconsin's scheme imposes on core political speech surrounding referenda are broader in scope and application and effect more onerous burdens than did those the Supreme Court has agreed were overbroad in the same context. *A fortiori*, they are not narrowly tailored and are unconstitutional as a matter of law.[8] Plaintiff has a strong likelihood of success on the merits.

---

[8]Wisconsin's scheme is also far broader than that which the Supreme Court has found narrowly tailored in the candidate election context, where the anti-corruption and related informational interests *are* relevant. Disclosure laws for individuals and groups "who occasionally make independent expenditures" are narrowly drawn, and therefore constitutional, if they require the group to report only when it makes an expenditure for express advocacy and the report's contents are limited to the amount spent, the recipient of the expenditure, the identification of contributors who gave for the articulated purpose of influencing the election, and the

**Memorandum in Support of TRO\PI**         13

## II. Mr. Swaffer Will Suffer Irreparable Harm in the Absence of the Injunction and Has No Adequate Remedy at Law.

In addition to having a high likelihood of success on the merits, Mr. Swaffer will suffer irreparable harm unless he receives the requested injunctive relief. In the context of the First Amendment monetary damages are inadequate. *Joelner*, 378 F.3d at 619 -620. He is barred by criminal and civil penalties from exercising his First Amendment rights, and the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Mr. Swaffer is faced with a choice. He can choose to comply with unconstitutional burdens on his First Amendment rights, or he can undertake his activities without complying and face enforcement action. Only an injunction can remedy this irreparable harm.

## III  A Preliminary Injunction Will Not Impose Any Hardship on the GAB or Others

The GAB will not be harmed by Mr. Swaffer participating in his First Amendment activity. "[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute." *Joelner*, 378 F.3d at 619. Thus, given the high likelihood of success on the merits, the GAB will not be harmed.

---

contributors who earmarked their giving for expenditures for express advocacy. *See MCFL*, 479 U.S. at 252 (paraphrasing Title 2 U.S. Code § 434(c)). "These reporting obligations provide precisely the information necessary to monitor [a group]'s independent spending activity and its receipt of contributions." *MCFL*, 479 U.S. at 262.

"Overly burdensome administrative costs and organizational requirements" are among what the Supreme Court called "the full panoply of regulations that accompany status as a political committee" in *MCFL*, 479 U.S. at 262, and include those that require a group "to assume a more sophisticated organizational form, to adopt specific accounting procedures, to file periodic detailed reports, and to [accept contributions only from the group's members]." *Id.* at 255.

**Memorandum in Support of TRO\PI**       14

## IV. A Preliminary Injunction Is In the Public Interest

The question of the public interest follows the likelihood of success on the merits. "The First Amendment, in particular, serves significant societal interests." *Bellotti*, 435 U.S. at 766. "[I]t is always in the public interest to protect First Amendment liberties." *Id*. (citations and quotations omitted). Allowing Mr. Swaffer to produce and distribute his Mailer and Signs without compromising his First Amendment rights assures that "debate on public issues should be uninhibited, robust and wide-open." *McIntyre,* 514 U.S. at 346 (citation omitted). The requested injunctive relief serves the public interest.

Dated: March 10, 2008

Respectfully submitted,

/s/ Michael D. Dean

| | |
|---|---|
| James Bopp, Jr., Ind. #2838-84 | Michael D. Dean |
| Jeffrey P. Gallant, Va. #46876 | 20975 Swenson Drive |
| Clayton J. Callen, Mo. #59885 | Suite 125 |
| Bopp, Coleson & Bostrom | Waukesha, WI 53186 |
| 1 South Sixth Street | 262/798-8044 telephone |
| Terre Haute, IN 47807-3510 | 262/798-8045 facsimile |
| 812/232-2434 telephone | *Local Counsel for Plaintiff* |
| 812/234-3685 facsimile | |
| *Lead Counsel for Plaintiff* | |

**Memorandum in Support of TRO\PI**     15